## UNITED STATES DISTRICT COURT
## SOUTHERN DISTRICT OF NEW YORK

|  |  |
|---|---|
| BRIAN QUILL, Individually And On Behalf of All Others Similarly Situated, ) ) ) ) Plaintiff, ) ) vs. ) ) ) CENTERLINE HOLDING CO., INC., MARC D. ) SCHNITZER, ROBERT L. LEVY, STEPHEN ) M. ROSS, JEFF T. BLAU, and LEONARD W. ) COTTON, ) ) ) Defendants ) ) | **CIVIL ACTION NO. 08-CV-01902** **CORRECTED CLASS ACTION COMPLAINT FOR VIOLATIONS OF FEDERAL SECURITIES LAWS** **JURY TRIAL DEMANDED** |



FEB 27 2008

U.S.D.C. S... N.Y.

CASHIERS

## INTRODUCTION

1.      This is a federal class action on behalf of purchasers of the common stock of Centerline Holding Co., Inc.[1] ("Centerline" or the "Company") between **December 5, 2006 and December 28, 2007,** inclusive (the "Class Period"), seeking to pursue remedies under the Securities Exchange Act of 1934 (the "Exchange Act"). As alleged herein, Defendants published a series of materially false and misleading statements that Defendants knew and/or recklessly disregarded were materially false and misleading at the time of such publication, and that omitted to reveal material information necessary to make Defendants' statements, in light of such material omissions, not materially false and misleading.

---

[1] Prior to April 2, 2007, the Company was called CharterMac.

## JURISDICTION AND VENUE

2.     The claims asserted herein arise under and pursuant to Sections 10(b) and 20(a) of

the Exchange Act [15 U.S.C. §§ 78j(b) and 78t(a)] and Rule 10b-5 promulgated thereunder by

the United States Securities and Exchange Commission ("SEC") [17 C.F.R. § 240.10b-5].

3.     This Court has jurisdiction over the subject matter of this action pursuant to 28

U.S.C. §§ 1331 and 1337, and Section 27 of the Exchange Act [15 U.S.C. § 78aa].

4.     Venue is proper in this District pursuant to Section 27 of the Exchange Act, and

28 U.S.C. § 1391(b). Centerline maintains its principal place of business in this District and

many of the acts and practices complained of herein occurred in substantial part in this District.

5.     In connection with the acts alleged in this complaint, Defendants, directly or

indirectly, used the means and instrumentalities of interstate commerce, including but not limited

to the mails, interstate telephone communications, and the facilities of the national securities

markets.

## PARTIES

6.     Plaintiff **BRIAN QUILL** ("Plaintiff"), as set forth in the accompanying

certification, incorporated by reference herein, purchased the common stock of Centerline at

artificially inflated prices during the Class Period and has been damaged thereby.

7.     Defendant **CENTERLINE HOLDING CO., INC**. is a corporation organized

under the laws of the State of Delaware that maintains its chief executive offices and principal

place of business at 625 Madison Avenue, New York, NY 10022. According to the Company's

profile on *Yahoo.com/finance*, Centerline is a publicly-owned investment holding firm which,

through its subsidiaries, operates as a real estate finance and investing company providing capital

solutions to developers and owners of properties, as well as investment products to institutional

2

and retail investors. The Company provides its services to multifamily, office, retail, industrial, mixed-use, and other properties, and operates through five business segments including: (i) Affordable Housing; (ii) Asset Management; (iii) Commercial Real Estate; (iv) Credit Risk Products; and (v) Consolidated Partnerships. Through its subsidiaries, the Company provides financing and investment products; credit intermediation and loans; and monitoring and managing of affordable housing and commercial real estate assets. At the inception of the Class Period, the Affordable Housing segment was responsible for the vast majority of the Company's total revenues, generating almost 56% of Centerline's revenues in 3Q:06.

8.      Defendant **MARC D. SCHNITZER** ("Schnitzer") is and during the Class Period was Chief Executive Officer, President, and Managing Trustee and a member of the Board of Directors of the Company. According to the Company's Annual Proxy statement filed with the SEC on or about April 23, 2007, Defendant Schnitzer "directs the day-to-day operations of the Company and is responsible for corporate development and strategic planning." In addition to the foregoing, during the Class Period, Defendant Schnitzer signed or certified the Company's SEC filings, including its annual 2006 Form 10-K and its Form(s) 10-Q for the interim periods. Defendant Schnitzer is also the Chairman of the board of trustees of American Mortgage Acceptance Company ("AMAC"), a publicly traded real estate investment trust managed by an affiliate of the Company.

9.      Defendant **ROBERT L. LEVY** ("Levy") is and during the Class Period was Chief Financial Officer of the Company and Chief Financial Officer of AMAC. During the Class Period, Defendant Levy signed or certified the Company's SEC filings, including the annual 2006 Form 10-K and the Company's Form(s) 10-Q for the interim periods.

10.    Defendant **STEPHEN M. ROSS** ("Ross") is, and during the Class Period was, Chairman of the Board of the Company and founder, Chairman, Chief Executive Officer and Managing General Partner of The Related Companies, LP ("TRCLP"). During the Class Period, Defendant Ross signed the Company's SEC filings, including its annual 2006 Form 10-K. During 2006, TRCLP's wholly owned subsidiary, Related Management Co. received at least $4.3 million in management fees related to purported services provided to the Company, and TRCLP received an additional $620,000 for other management related services.

11.    Defendant **JEFF T. BLAU** ("Blau") is and during the Class Period was a Managing Trustee of the Company, a member of the Investment Committee of the Board, and a member of the Board of Trustees of AMAC. Defendant Blau is also a Managing Trustee and the President of TRCLP. During the Class Period, Defendant Blau signed the Company's SEC filings, including its annual 2006 Form 10-K.

12.    Defendant **LEONARD W. COTTON** ("Cotton") is and during the Class Period was Vice Chairman of the Board of the Company. Previously, Defendant Cotton also served as the Chief Executive Officer of Centerline REIT, Inc. (formerly ARCap REIT, Inc., and together with its parent Centerline Investors LLC and its subsidiaries, "Centerline REIT"), which was acquired by the Company in 2006, and was Chairman and Chief Executive Officer of Centerline REIT's predecessor REMICap. According to the Company's Annual Proxy statement filed with the SEC on or about April 23, 2007, during his tenure at Centerline REIT, Defendant Cotton was "instrumental in establishing Centerline REIT as a nationally recognized commercial mortgage backed securities due diligence and acquisition firm." During the Class Period, Defendant Cotton signed the Company's SEC filings, including its annual 2006 Form 10-K.

4

13.    The Defendants referenced above in ¶¶ 8-12 are referred to herein as the "Individual Defendants." According to the Company's Annual Proxy statement filed with the SEC on or about April 23, 2007, as of March 31, 2007, the Individual Defendants owned directly or beneficially common shares of the Company, as follows:

| Name | Title | Amount & Nature of Beneficial Ownership | % of Class |
|---|---|---|---|
| ROSS | Chairman | 11,070,430 [1] | 13.9% |
| SCHNITZER | Managing Trustee, Chief Executive Officer and President | 1,244,731 | 1.6% |
| LEVY | Chief Financial Officer | 112,936 | * |
| BLAU | Managing Trustee | 10,295,085 [2] | 13.0% |
| COTTON | Managing Trustee | 366,008 | * |
| All Executive Officers and Trustees of the Company as a group (19 persons) | | 14,144,297 | 17.6% |

(1)    Includes: (i) 475,345 shares owned directly by Defendant Ross; (ii) 10,194,400 Special Common Units (which Special Common Units are pledged as security for a line of credit) and 685 Common Shares owned by Related General II, L.P. TRCLP owns 100% of Related General II, L.P. and Defendant Ross owns 92% of TRCLP; (iii) 400,000 options exercisable for Common Shares on a one-for-one basis (which are exercisable within 60 days).

(2)    Includes: (i) 60,000 shares owned directly by Defendant Blau; (ii) 10,194,400 Special Common Units and 685 Common Shares owned by Related General II, L.P. TRCLP owns 100% of Related General II, L.P. and Defendant Blau owns 8% of TRCLP; and (iii) 40,000 Special Common Units owned directly.

14.    Because of the Individual Defendants' positions with the Company, they had access to the adverse undisclosed information about its business, operations, products, operational trends, financial statements, markets and present and future business prospects *via* access to internal corporate documents (including the Company's operating plans, budgets and forecasts and reports of actual operations compared thereto), conversations and connections with

5

other corporate officers and employees, attendance at management and Board of Directors meetings and committees thereof and *via* reports and other information provided to them in connection therewith.

15.    It is appropriate to treat the Individual Defendants as a group for pleading purposes and to presume that the false, misleading and incomplete information conveyed in the Company's public filings, press releases and other publications as alleged herein are the collective actions of the narrowly defined group of Defendants identified above. Each of the above officers of Centerline, by virtue of their high-level positions with the Company, directly participated in the management of the Company, was directly involved in the day-to-day operations of the Company at the highest levels and was privy to confidential proprietary information concerning the Company and its business, operations, products, growth, financial statements, and financial condition, as alleged herein. Said Defendants were involved in drafting, producing, reviewing and/or disseminating the false and misleading statements and information alleged herein, were aware, or recklessly disregarded, that the false and misleading statements were being issued regarding the Company, and approved or ratified these statements, in violation of the federal securities laws.

16.    As officers and controlling persons of a publicly-held company whose common stock was, and is, registered with the SEC pursuant to the Exchange Act, and was traded on the New York Stock Exchange (the "NYSE"), and governed by the provisions of the federal securities laws, the Individual Defendants each had a duty to disseminate promptly, accurate and truthful information with respect to the Company's financial condition and performance, growth, operations, financial statements, business, products, markets, management, earnings and present and future business prospects, and to correct any previously-issued statements that had become

materially misleading or untrue, so that the market price of the Company's publicly-traded common stock would be based upon truthful and accurate information. The Individual Defendants' misrepresentations and omissions during the Class Period violated these specific requirements and obligations.

17.    The Individual Defendants participated in the drafting, preparation, and/or approval of the various public and shareholder and investor reports and other communications complained of herein and were aware of, or recklessly disregarded, the misstatements contained therein and omissions therefrom, and were aware of their materially false and misleading nature. Because of their Board membership and/or executive and managerial positions with Centerline, each of the Individual Defendants had access to the adverse undisclosed information about Centerline's business prospects and financial condition and performance as particularized herein and knew (or recklessly disregarded) that these adverse facts rendered the positive representations made by or about Centerline and its business issued or adopted by the Company materially false and misleading.

18.    The Individual Defendants, because of their positions of control and authority as officers and/or directors of the Company, were able to and did control the content of the various SEC filings, press releases and other public statements pertaining to the Company during the Class Period. Each Individual Defendant was provided with copies of the documents alleged herein to be misleading prior to or shortly after their issuance and/or had the ability and/or opportunity to prevent their issuance or cause them to be corrected. Accordingly, each of the Individual Defendants is responsible for the accuracy of the public reports and releases detailed herein and is therefore primarily liable for the representations contained therein.

19.    Each of the Defendants is liable as a participant in a fraudulent scheme and course of business that operated as a fraud or deceit on purchasers of Centerline common stock by disseminating materially false and misleading statements and/or concealing material adverse facts. The scheme: (i) deceived the investing public regarding Centerline's business, operations, management and the intrinsic value of Centerline common stock; (ii) enabled Defendants to artificially inflate the price of Centerline shares; (iii) enabled Defendants to arrange to sell the Company's most productive assets and to arrange to allow Defendants Ross, Blau and TRCLP to invest in Centerline on preferential terms, not favorable to Centerline's public shareholders; and (iv) it caused plaintiff and other members of the Class to purchase Centerline common stock at artificially inflated prices.

## PLAINTIFF'S CLASS ACTION ALLEGATIONS

20.    Plaintiff brings this action as a class action pursuant to Federal Rule of Civil Procedure 23(a) and (b)(3) on behalf of a Class, consisting of all those who purchased or otherwise acquired the common stock of Centerline between **December 5, 2006 and December 28, 2007,** inclusive (the "Class") and who were damaged thereby. Excluded from the Class are Defendants, the officers and directors of the Company, at all relevant times, members of their immediate families and their legal representatives, heirs, successors or assigns and any entity in which Defendants have or had a controlling interest.

21.    The members of the Class are so numerous that joinder of all members is impracticable. Throughout the Class Period, Centerline common stock was actively traded on the NYSE. As of February 23, 2007, the Company had over 51.404 million shares of common stock issued and outstanding. While the exact number of Class members is unknown to plaintiff at this time and can only be ascertained through appropriate discovery, plaintiff believes that there are

hundreds or thousands of members in the proposed Class. Record owners and other members of the Class may be identified from records maintained by Centerline or its transfer agent and may be notified of the pendency of this action by mail, using the form of notice similar to that customarily used in securities class actions.

22.    Plaintiff's claims are typical of the claims of the members of the Class as all members of the Class are similarly affected by Defendants' wrongful conduct in violation of federal law that is complained of herein.

23.    Plaintiff will fairly and adequately protect the interests of the members of the Class and has retained counsel competent and experienced in class and securities litigation.

24.    Common questions of law and fact exist as to all members of the Class and predominate over any questions solely affecting individual members of the Class. Among the questions of law and fact common to the Class are:

(a)    whether the federal securities laws were violated by Defendants' acts as alleged herein;

(b)    whether statements made by Defendants to the investing public during the Class Period misrepresented material facts about the business, operations and management of Centerline; and

(c)    to what extent the members of the Class have sustained damages and the proper measure of damages.

25.    A class action is superior to all other available methods for the fair and efficient adjudication of this controversy since joinder of all members is impracticable. Furthermore, as the damages suffered by individual Class members may be relatively small, the expense and burden of individual litigation make it impossible for members of the Class to individually

9

redress the wrongs done to them. There will be no difficulty in the management of this action as a class action.

<div align="center"><b>SUBSTANTIVE ALLEGATIONS</b></div>

<div align="center"><b>Defendants' Materially False and Misleading<br>Statements Made During the Class Period</b></div>

26.     **Investor Presentation**. December 5, 2006, the inception of the Class Period, Defendants hosted an "investor luncheon," during which Defendants Schnitzer, Levy and Cotton presented on behalf of the Company. According to the introductory statements made by Defendant Schnitzer, the purpose and intent of this investor presentation was ***to "articulate [the Company's] strategy in a clearer and clearer way so that we can tell more people about it, can hopefully interest more people in following our company."*** Schnitzer stated that this explanation was especially important given that Centerline was a company "that has been fairly difficult to explain," because its business was viewed as being "relatively complicated."

27.     Accordingly, during the course of this investor presentation luncheon, Defendant Schnitzer articulated the Company's overall business strategy, in part, as follows:

> We really see ourselves as being in the middle of the sources of capital that want to play in the real estate space and the consumers of that capital who are our developers and borrowers of whom we have over 800 direct developer clients. It was interesting when we were selling our CDO that a lot of the buyers thought that we were somewhat unique in that almost all the loans in the CDO, in fact all the loans in this CDO, were directly originated by our originators and through our platform. Well I had always sort of taken that for granted in the real estate business if you're going -- if you're going to have loans, you're going to originate them yourself.

> But part of that is because we have a really fully diversified real estate origination underwriting risk management and servicing platform that many of the issuers of CDOs today in the capital markets are really just buying loans and investments from other companies who themselves are originating them. So we think that's a key advantage to us to be able to go out and get competitive capital markets execution because of our ability and our capability not only to buy the assets right, but to watch them properly and then to fix them to the extent they break

<div align="center">10</div>

over time. So we're in the middle. We are a real estate fund manager managing funds for all our investors that want to be in the real estate space, whether they're direct loan investments, tax credit investments, high yield CMBS investments, agency loans, conduit insurance company investments, preferred equity and of course managing AMAC. That list will grow over time as we organically or through acquisition add capability to develop other products that will appeal to these same investors or new investment products in the real estate space that will appeal to other investors that we haven't yet tapped, and then on the other side being a capital provider to our developers and borrowers.

We want to be able to play in every part of the capital structure, in any type of real estate asset that we think is a good real estate asset that prices the risk properly for us to look at. So whether it's first mortgage debt, higher yielding mortgage or bridge debt, B notes, tax credit equity, et cetera, we want to be able to look, asses the risk in any property type, and figure out which pools of our capital are appropriate for the different needs of that property.

28.    In addition to the foregoing, Defendant Schnitzer also commented on the Company's purported risk management, and especially as this pertained to its Mortgage and Collateralized Debt Obligations ("CDOs"), again in part, as follows:

[W]ith respect to credit risk, the 2 billion or so of investment in the subordinate high yield CMBS is held off-balance sheet in funds that we manage largely for pension funds and life insurance companies. So it's not on-balance sheet, number one, so that's one way that we've mitigated that credit risk as it relates to CharterMac.

The other way that we mitigate the credit risk is through our ability as a special servicer and through our efforts to watch these assets and the investment that we've made in technology and the investment that we've made in people in knowing what's going on at every asset even better than the primary servicer at all the assets. So we mitigate the credit risk in the assets kind of the old fashioned way by watching them better than we think anybody else watches them, but also sort of in the ultimate doomsday scenario they're really not on-balance sheet at the end of the day. Clearly, we want to do a good job in managing the credit risk and not losing money for our institutional investors.

* * *

As far as the expertise that came on board with the [ARCap] acquisition, I really view that as a transforming event for our company because for 20 years we've been focused essentially on multifamily first, government assisted or affordable multifamily than in more conventional, but now we have really one of the most highly respected teams who focused on other assets outside of that area.

11

* * *

We're looking at a host of different products today that would play to that expertise that has come now as part of CharterMac to know how to properly assess the risk in all these other property types and then to manage those assets. So we're looking at equity products that might be appealing both to our institutional investors and our developer borrower community as well as broadening what we're doing in the CMBS [Commercial Mortgage Backed Securities] field.

29.    Regarding the Company's plan for purported growth and continued expansion,

Defendant Schnitzer also stated, in part, the following:

In 2005 we proxied the shareholders and they approved the moving of the leverage limitation, putting that in the hands of the Board and removing the limitation on the assets. And what we explained to them was that we wanted to change AMAC into a more highly levered company. And the analog that I think of today is kind of like capital trust a little bit, a company that would avail itself of CDO technology, ultimately transforming itself into a more highly levered company that would lever off of CharterMac's origination capability, underwriting capability and asset management capability to create a program of acquiring various types of commercial real estate mortgage products and potentially equity products that would provide it with a growing return on equity and through that CDO technology drastically lower its cost of capital by more highly levering the balance sheet.

So that's really the growth program. The deal that we just closed at AMAC, which was a $360-some million CDO which had about 400 million in loans altogether, that's really the blueprint for growth for that company and we would hope next year to do -- to do a larger volume of activity through AMAC. And AMAC is a critical partner with CharterMac in being a great capital source as we look at our different capital sources. So I think for AMAC this latest CDO is indicative of the type of business we want to do over the next several years.

30.    In addition to the foregoing, Defendant Levy was also quoted during the

December 5, 2006 Presentation, in part, as follows:

Well, certainly, as we evolve, we're figuring out new and better ways to lever the company. There have been many steps in that direction actually in 2006. Number one, the advent of Centerbrook, our ability to lever our bonds through our own internal securitization programs, credit enhancement programs, and that has allowed us to more highly lever our bonds in a more attractive manner because we provide Centerbrook with -- one of the things that Centerbrook allows us to do is

12

we provide our own credit against our bonds for our securitization programs, so we're paying ourselves in effect for that credit, and that has allowed us to lever our bonds much more attractively than we have in the past.

* * *

I think ideally what we have told our Board and what we think makes a lot of sense is to bring our leverage from the current 53% level probably up to about 60 to 65% over the next three to five years as we continue to find more efficient ways to lever our company. We're not looking to do -- to lever the company just for leverage sake. We want to do it in an efficient manner than provides us a way to boost our return on equity, which was really the initial goal of the Centerbrook transaction was to create more effective leverage against our bonds to provide us with a better ROE for our company.

31.    **4Q FY:06 Results Announced**. On March 12, 2007, Defendants published a release announcing purported results for the fourth quarter and full year ended December 31, 2007. This release also stated, in part, the following:

Financial Highlights

The table below summarizes CharterMac's revenues, revenues adjusted to exclude the impact of consolidated partnerships, Cash Available for Distribution ("CAD"), CharterMac's primary performance measure, and net income for the three and twelve months ended December 31, 2006 and 2005.

| (In thousands, except per share data) | Three Months Ended December 31, | | | Twelve Months Ended December 31, | | |
|---|---|---|---|---|---|---|
| | 2006 | 2005 | % change | 2006 | 2005 | % change |
| Revenues | $127,942 | $79,828 | 60.3% | $387,259 | $295,097 | 31.2% |
| Revenues Adjusted to exclude Consolidated Partnerships | $107,783 | $89,845 | 20.0% | $371,242 | $320,520 | 15.8% |
| CAD | $ 28,469 | $27,287 | 4.3% | $111,030 | $114,710 | (3.2%) |
| Net Income | $ 7,818 | $ 6,107 | 28.0% | $ 41,294 | $ 59,014 | (30.0%) |
| Per Share Data (diluted): | | | | | | |
| CAD | $ 0.49 | $ 0.47 | 4.3% | $ 1.89 | $ 1.97 | (4.1%) |
| Net Income | $ 0.11 | $ 0.08 | 41.8% | $ 0.62 | $ 0.98 | (36.5%) |

32.    Regarding the Company's pro forma performance, defined by Defendants as Cash Available for Distribution, or CAD, the March 12, 2007 release also stated, in part, the following:

> CharterMac believes that Cash Available for Distribution ("CAD") is helpful to investors in measuring the performance of our Company. CAD is the performance measure used by our chief decision-makers to allocate resources among our segments. CAD represents net income (computed in accordance with GAAP), adjusted for:
>
> --    Cash fees and other revenues received but deferred in accordance with GAAP. Fees recognized for CAD but deferred for GAAP purposes are generally earned over a period of time in connection with certain of our product lines, such as fund sponsorship and credit intermediated fees.
>
> --    The effect of straight line revenue recognition of interest income on revenue bonds with fixed changes in interest rates.
>
> --    Depreciation and amortization, including write-off of intangible assets.
>
> --    Non-cash gains recognized on sale of mortgage loans when servicing rights are retained.
>
> --    Losses on sales of loans or repayment of revenue bonds.
>
> --    Impairment losses.
>
> --    The portion of tax benefit or provision that is not expected to be realized in cash.
>
> --    Non-cash compensation expenses.
>
> -- The difference between earnings allocated to Subsidiary Equity in accordance with GAAP and distributions to holders of that equity.

33.    In addition to the foregoing, the March 12, 2007 release also quoted Defendant Schnitzer, in part, as follows:

> "We completed several major initiatives in 2006 that significantly changed our Company and transformed CharterMac from a firm focused mainly on affordable and multifamily housing to a full-service real estate finance and investment company," said Marc D. Schnitzer, Chief Executive Officer and President of

14

CharterMac. "Our accomplishments included the acquisition of ARCap, one of the nation's leading high-yield CMBS fund managers, the launch of Centerbrook Financial, our credit risk products company, the rollout of a new credit approval process, the divestiture of two non-core investments and the completion of a corporate re-engineering. We believe that all of these initiatives will help create a more efficient operating structure and provide us with a best-in-class platform to grow and compete in a very competitive industry. Today we can provide a broad array of debt and equity products for any type of real estate property."

34.    **FY 2006 Form 10-K.** Also on March 12, 2007, Defendants filed with the SEC the Company's 2006 Form 10-K for the full year ended December 31, 2006, signed by Defendants Ross, Cotton, Levy Blau, and Schnitzer and certified by Defendants Schnitzer and Levy. In addition to making substantially similar statements concerning the Company operations, including expenses, costs and ratios, as had been published previously, the 2006 Form 10-Q also provided statements concerning the Company's Portfolio Investing, in part, as follows:

1.    PORTFOLIO INVESTING

We conduct most of our portfolio investing through our CharterMac Equity Issuer Trust I and CharterMac Equity Issuer Trust II subsidiaries. Throughout this document, we will refer to both of these subsidiaries collectively as "Equity Issuer".

As of December 31, 2006, our revenue bond portfolio includes direct and indirect interests in mortgage revenue bonds with an aggregate fair value of approximately $2.8 billion (prior to $397.3 million of eliminations related to bonds issued by partnerships we consolidate), secured by affordable multifamily properties containing 56,048 units located in 30 states and the District of Columbia. While most of these mortgage revenue bonds generate tax-exempt income, certain of them generate taxable income. The taxable mortgage revenue bonds are held at the parent trust.

Our Portfolio Investing business generates most of its income and cash flow from a positive spread between the interest earned from our mortgage revenue bond portfolio and the cost of capital we use to purchase the bonds. We occasionally receive participating interest on certain mortgage revenue bonds which is equal to a percentage of net property cash flow of the net sale or refinancing proceeds. We also receive fees from borrowers for the acquisition of new mortgage revenue bonds.

The acquisition of mortgage revenue bonds requires capital. In addition to using a portion of our operating cash flows, we obtain such capital by securitizing most of the bonds we purchase and by issuing equity securities.

\* \* \*

The increase in mortgage revenue bond interest income is primarily due to expanding our revenue bond portfolio in 2005 and 2006, although the rate of investment has slowed due to challenging market conditions we have experienced since 2004. Also included in mortgage revenue bond interest income is contingent interest of approximately $5.2 million in 2006, $2.6 million in 2005 and $230,000 in 2004, related to bonds prepaid during those years.

35.    **Controls.** The Company's 2Q:07 Form 10-Q also contained representations which attested to the purported effectiveness and sufficiency of the Company's controls and procedures, as follows:

### ITEM 9A. CONTROLS AND PROCEDURES.

(a)    Evaluation of Disclosure Controls and Procedures. Our Chief Executive Officer and Chief Financial Officer have evaluated the effectiveness of our disclosure controls and procedures (as defined in Rule 13a-15(e) or Rule 15a-15(e) under the Securities Exchange Act of 1934, as amended (the "Exchange Act")) as of the end of the period covered by this annual report. Based on such evaluation, such officers have concluded that our disclosure controls and procedures as of the end of the period covered by this annual report were effective to ensure that information required to be disclosed by the Company in the reports that the Company files or submits under the Exchange Act is recorded, processed, summarized and reported, within the time periods specified in the SEC rules and forms, and to ensure that such information is accumulated and communicated to the Company's management, including the Chief Executive Officer and Chief Financial Officer, as appropriate, to allow timely decisions regarding required disclosure.

\* \* \*

(b)    INTERNAL CONTROL OVER FINANCIAL REPORTING. There have not been any significant changes in our internal control over financial reporting during the period to which this report relates that have materially affected, or are reasonably likely to materially affect, our internal control over financial reporting.

36.    **Certifications.** In addition to the foregoing, the Company's 2Q:07 Form 10-Q also contained Certifications by Defendants Schnitzer and Levy, that attested to the purported accuracy and completeness of the Company's financial and operational reports, as follows:

## CERTIFICATION

1.    I have reviewed this annual report on Form 10-K of CharterMac;

2.    Based on my knowledge, this report does not contain any untrue statement of a material fact or omit to state a material fact necessary in order to make the statements made, in light of the circumstances under which such statements were made, not misleading with respect to the period covered by this annual report;

3.    Based on my knowledge, the financial statements, and other financial information included in this annual report, fairly present in all material respects the financial condition, results of operations and cash flows of the registrant as of, and for, the periods presented in this report;

4.    The registrant's other certifying officers and I are responsible for establishing and maintaining disclosure controls and procedures (as defined in Exchange Act Rules 13a-15(e) and 15d-15(e)) and internal control over financial reporting (as defined in Exchange Act Rules 13a-15(f) and 15d-15(f)) for the registrant and we have:

    a)    designed such disclosure controls and procedures, or caused such disclosure controls and procedures to be designed under our supervision, to ensure the material information relating to the registrant, including its consolidated subsidiaries, is made known to us by others within those entities, particularly during the period in which this annual report is being prepared;

    b)    designed such internal control over financial reporting, or caused such internal control over financial reporting to be designed under our supervision, to provide reasonable assurance regarding the reliability of financial reporting and the preparation of financial statements for external purposes in accordance with generally accepted accounting principals;

    c)    evaluated the effectiveness of the registrant's disclosure controls and procedures and presented in this report our conclusions about the effectiveness of the disclosure controls and procedures, as of the end of the period covered by this report based on such evaluation; and

    d)    disclosed in this report any change in the registrant's internal control over financial reporting that occurred during the registrant's most recent fiscal quarter that has materially affected, or is reasonably likely to materially affect, the registrant's internal control over financial reporting; and

5. The registrant's other certifying officers and I have disclosed, based on our most recent evaluation of internal control over financial reporting, to the registrant's auditors and the audit committee of the registrant's board of directors or persons performing the equivalent functions:

a) all significant deficiencies and material weaknesses in the design or operation of internal control over financial reporting which are reasonably likely to adversely affect the registrant's ability to record, process, summarize and report financial information; and

b) any fraud, whether or not material, that involves management or other employees who have a significant role in the registrant's internal control over financial reporting.

Date: March 9, 2007 By: /s/ **MARC D. SCHNITZER**
------------- ---------------------
Marc D. Schnitzer
Chief Executive Officer

* * *

Date: March 9, 2007 By: /s/ **ROBERT L. LEVY**
------------- ------------------
Robert L. Levy
Chief Financial Officer

**CERTIFICATION PURSUANT TO**
**18. U.S.C. SECTION 1350,**
**AS ADOPTED PURSUANT TO**
**SECTION 906 OF THE SARBANES-OXLEY ACT OF 2002**

In connection with the Annual Report of CharterMac (the "Company") on Form 10-K for the year ending December 31, 2006, as filed with the Securities and Exchange Commission on the date hereof (the "Report"), I, **Marc D. Schnitzer,** Chief Executive Officer of the Company and I, Robert L. Levy, Chief Financial Officer of the Company, certify, pursuant to 18 U.S.C. Section 1350, as adopted pursuant to Section 906 of the Sarbanes-Oxley Act of 2002, that:

(1) The Report fully complies with the requirements of Section 13(a) or 15(d) of the Securities Exchange Act of 1934; and

(2) The information contained in the Report fairly presents, in all material respects, the financial condition and results of operations of the Company.

By: /s/ **MARC D. SCHNITZER** By: /s/ **ROBERT L. LEVY**
---------------------------------------- ---------------------------------

Marc D. Schnitzer     Robert L. Levy
Chief Executive Officer   Chief Financial Officer
March 9, 2007       March 9, 2007

37.    The statements made by Defendants during the December 5, 2006 Investor Luncheon, or contained in the March 12, 2007 release and/or the Company's 2006 Form 10-K, were each materially false and misleading when made and were known by Defendants to be false or were recklessly disregarded as such thereby, at that time, for the following reasons, among others:

(a)    At all times during the Class Period, it was not true that the Company was continuing to operate according to plan when, throughout that time, Defendants were *already* engaged in making plans to liquidate Centerline's entire mortgage bond portfolio, and to radically transform the Company's business model and risk profile, the result of which would impair Defendants ability to pay its dividends and result in a non-arms' length related-party transaction overly-favorable to Defendants Ross, Blau and TRCLP;

(b)    At all times during the Class Period, unbeknownst to investors, Defendants had materially understated the true risk of investing in the Company, by failing to report that Defendants were *already* engaged in negotiating for the sale of Centerline's bond portfolio—and major source of revenues—and by failing to report that this would result in the total transformation of the Company, by reducing profitability and adding significant new risks to investors;

(c)    Throughout the Class Period, it was also not true that Centerline contained adequate systems of internal operational or financial controls, such that Centerline's reported financial statements were true, accurate or reliable;

(d)    As a result of the foregoing, throughout the Class Period it also was not true that the Company's financial statements and reports were prepared in accordance with GAAP ad SEC rules; and

(e)    As a result of the aforementioned adverse conditions which Defendants failed to disclose, throughout the Class Period, Defendants lacked any reasonable basis to claim that Centerline was operating according to plan, or that Centerline could achieve guidance sponsored and/or endorsed by Defendants.

38.    **1Q:07 Results Announced**. On May 10, 2007, Defendants published a release announcing purported results for the first quarter of 2007, the period ended March 31, 2007. This release stated, in part, the following:

Financial Highlights

The table below summarizes Centerline's revenues, revenues adjusted to exclude the impact of consolidated partnerships, Cash Available for Distribution ("CAD"), Centerline's primary performance measure, and net income for the three months ended March 31, 2007 and 2006.

| (In thousands, except per share data) | Three Months Ended March 31, | |
|---|---|---|
| | 2007 | 2006 |
| Revenues | $117,165 | $72,139 |
| Revenues Adjusted to exclude Consolidated Partnerships | $87,276 | $76,547 |
| CAD | $4,642 | $15,255 |
| Net (Loss) Income | $(14,745) | $14,657 |
| Per Share Data (diluted): | | |
| CAD | $0.08 | $0.26 |
| Net (Loss) Income | $(0.27) | $0.23 |

Centerline recorded a net loss for the 2007 period as compared to net income in the 2006 quarter. Much of the decline was due to impairment charges recognized on revenue bonds, a reserve against associated receivables and non-cash costs stemming from the acquisition of Centerline Investors, such as amortization of restricted shares awarded in connection with the transaction and amortization of intangible assets acquired at that time. Other factors contributing to the net loss in the 2007 period were increased interest costs and severance costs associated with

20

the first quarter retirement of Centerline's Chief Operating Officer, Alan Hirmes. The growth in revenues was due mostly to revenues earned by funds we consolidated upon the acquisition of Centerline Investors in August 2006, and the interest income from investments held by Centerline Investors.

39.    Regarding the Company's segment performance, the May 10, 2007 release also

stated, in part, the following:

In connection with the August, 2006 acquisition of Centerline Investors I LLC (formerly ARCap Investors, L.L.C. - "Centerline Investors") and the Company's subsequent corporate re-engineering, Centerline has strengthened its asset management platform and greatly enhanced the Company's asset management capabilities. This quarter, as the properties have seasoned, the Asset Management Group reassessed the Company's strategy with respect to the recovery of Centerline's advances to these properties and undertook an initiative to determine the most advantageous strategy for preserving the Company's capital. While the strategy remains under review, based upon the current analysis, Centerline recorded the $13.7 million impairment with respect to four of the revenue bonds due in part to revised estimates of the level and timing of cash flows for the valuation of the properties. In connection with that determination, the Asset Management Group concluded that advances made to partnerships in connection with those underlying properties may not be fully recoverable and the Company recorded a reserve of approximately $5.5 million.

Centerline's Asset Management Group continues to analyze strategic alternatives to determine the best course of action with respect to recovering the Company's advances and therefore, there are no assurances we will not record any future impairments.

40.    In addition to the foregoing, the May 10, 2007 release quoted Defendant

Schnitzer, in part, as follows:

*"[W]hile our dividend payout ratio is above 100% in this quarter, we are comfortable that our annual dividend will continue to have adequate coverage. We have solid investment pipelines in both our Commercial Real Estate Group and Affordable Housing Group and we continue to see a tremendous amount of transaction volume.* In addition, we are working on several new growth initiatives we expect to launch in 2007. *Based on the progress we have made executing our business plan to date, we remain confident that we will meet our investment and financial goals for the year and do not believe it is necessary to revise our guidance at this time."*

41.    **1Q:07 Form 10-Q.** The same day, May 10, 2007, Defendants filed with the SEC the Company's 1Q:07 Form 10-Q, for the quarter ended March 31, 2007, signed and certified by Defendants Levy and Schnitzer. In addition to making substantially similar statements concerning the Company operations as had been published previously, the 1Q:07 Form 10-Q also provided statements concerning the Company's Significant Accounting Policies and the Basis of its Accounting Presentation, in part, as follows:

> C. BASIS OF PRESENTATION
>
> The accompanying interim condensed consolidated financial statements have been prepared without audit. In the opinion of management, the financial statements contain all adjustments (consisting of only normal recurring adjustments) necessary to present fairly the financial statements of the interim periods. Given the seasonal nature of our business, the operating results for the interim periods may not be indicative of the results for the full year.
>
> Certain information and footnote disclosures normally included in the annual consolidated financial statements prepared in accordance with accounting principles generally accepted in the United States of America ("GAAP") have been condensed or omitted. It is suggested that these unaudited condensed consolidated financial statements be read in conjunction with the consolidated financial statements and notes thereto included in our Form 10-K for the year ended December 31, 2006. That filing on Form 10-K contains a summary of our significant accounting policies. ***There have been no material changes to these items since December 31, 2006.***

42.    **Controls.** The Company's 1Q:07 Form 10-Q again contained representations which attested to the purported effectiveness and sufficiency of the Company's controls and procedures, as follows:

> **ITEM 4. CONTROLS AND PROCEDURES**
>
> (a) EVALUATION OF DISCLOSURE CONTROLS AND PROCEDURES. Our Chief Executive Officer and Chief Financial Officer have evaluated the effectiveness of our disclosure controls and procedures (as defined in Rule 13a-15(e) or Rule 15a-15(e) of the Securities Exchange Act of 1934, as amended (the "Exchange Act")) as of the end of the period covered by this quarterly report. Based on such evaluation, such officers have concluded that our disclosure controls and procedures as of the end of the period covered by this quarterly

report were effective to ensure that information required to be disclosed by the Company in the reports that the Company files or submits under the Exchange Act is recorded, processed, summarized and reported within the time periods specified in the SEC rules and forms, and to ensure that such information is accumulated and communicated to the Company's management, including the Chief Executive Officer and Chief Financial Officer, as appropriate, to allow timely decisions regarding required disclosure.

\* \* \*

(b) INTERNAL CONTROL OVER FINANCIAL REPORTING. The changes in the Company's internal control over financial reporting (as defined in Rules 13a-15(f) and 15d-15(f) under the Exchange Act) that occurred during the Company's quarter ended March 31, 2007, that have materially affected, or are reasonably likely to materially affect, the Company's internal control over financial reporting are as follows:

o       The loan servicing, investor reporting, and asset management functions of the agency portfolio (i.e., Fannie Mae, Freddie Mac, GNMA, and other small investors) were transitioned to our Irving, Texas location along with a conversion of the servicing database to a new servicing system.

o       The Corporate Group revised the approval authority policy for debt investments, equity (including joint venture equity) investments and guarantees made by the Company and/or acquired through exercise of its rights under a prior investment, which was approved by the Board of Trustees.

o       The Treasury department of the Corporate Group was consolidated across all business segments.

Management has reviewed these material changes and obtained documentation from the process owners in order conclude comfort that these changes do not have a significant material impact on our controls over financial reporting.

43.     **Certifications.** In addition to the foregoing, the Company's 1Q:07 Form 10-Q contained Certifications by Defendants Levy and Schnitzer, that again attested to the purported accuracy and completeness of the Company's financial and operational reports, as follows:

**CERTIFICATION UNDER SECTION 906 OF THE
SARBANES-OXLEY ACT OF 2002
(UNITED STATES CODE, TITLE 18, CHAPTER 63, SECTION 1350)**

**ACCOMPANYING QUARTERLY REPORT ON FORM 10-Q**

**OF CENTERLINE HOLDING COMPANY**
**FOR THE QUARTER ENDED MARCH 31, 2007**

In connection with the Quarterly Report on Form 10-Q of Centerline Holding Company for the quarterly period ending March 31, 2007, as filed with the Securities and Exchange Commission on the date hereof (the "Report"), **Marc D. Schnitzer**, as Chief Executive Officer of our Company, and **Robert L. Levy**, as Chief Financial Officer of our Company, each hereby certifies, pursuant to 18 U.S.C. Section 1350, that:

(1)    The Report fully complies with the requirements of Section 13(a) or 15(d), as applicable, of the Securities Exchange Act of 1934; and

(2)    The information contained in the Report fairly presents, in all material respects, the financial condition and results of operations of our Company.

By: /s/ **MARC D. SCHNITZER**
----------------------------------

Marc D. Schnitzer
Chief Executive Officer
(Principal Executive Officer)

May 10, 2007

By: /s/ **ROBERT L. LEVY**
----------------------------

Robert L. Levy
Chief Financial Officer
(Principal Financial Officer and
      Principal Accounting Officer)

May 10, 2007

44.    The statements made by Defendants and contained in the Company's May 10, 2007 release and in the Company's 1Q:07 Form 10-Q were materially false and misleading when made and were know by Defendants to be false at that time, or were recklessly disregarded as such thereby, for the reasons stated herein in ¶37, *supra*.

45.    **2Q:07 Results Announced**. On August 9, 2007, Defendants published a release announcing purported results for the second quarter of 2007, the period ended June 30, 2007. This release also stated, in part, the following:

Second Quarter Highlights:

--    Cash Available for Distribution ("CAD")(a) per diluted share of $0.46, an increase of 12.2% over the second quarter of 2006;

--    Revenues, adjusted to exclude Consolidated Partnerships(b), of $94.6 million, an increase of 9.8% over the second quarter of 2006;

24

--    Direct Assets Under Management ("AUM") grew to $17.1 billion, an increase of 6.8% over the first quarter of 2007 and 35.4% over the second quarter of 2006;

--    Primary servicing loan portfolio totaled $31.5 billion at the end of the quarter, an increase of 37.9% over the first quarter of 2007 and 243.6% over the second quarter of 2006;

--    Centerline's Affordable Housing Group closed two low income housing tax credit ("LIHTC") funds totaling approximately $405.0 million;

--    Centerline's Commercial Real Estate Group originated $670.4 million in direct loans and acquired $265.6 million of structured finance products;

--    Stable credit performance within $2.8 billion revenue bond portfolio; At June 30, 2007, thirteen bonds with an outstanding balance of $70.1 million were delinquent, representing 2.5% of the entire portfolio;

--    Strong credit performance in Agency (Fannie Mae/Freddie Mac) servicing portfolio; At June 30, 2007, two loans with an outstanding balance of $8.0 million were delinquent, representing 0.09% of the entire agency portfolio; and

--    Delinquencies within CMBS portfolio at all time lows; At June 30, 2007, Centerline was the named special servicer on a portfolio of $89.3 billion and $210 million was delinquent, representing 0.24% of the entire portfolio, as compared to the industry average of 0.32% as reported by Trepp.

46.    In addition to the foregoing, the August 9, 2007 release also quoted Defendant Schnitzer, in part, as follows:

"In the past few weeks, the financial markets have been impacted by a re-pricing of risk and withdrawal of liquidity due to the serious credit problems in the single-family subprime mortgage industry," said Marc D. Schnitzer, Chief Executive Officer and President of Centerline. "Centerline does not have any single-family or subprime exposure whatsoever. We are a commercial real estate finance and investment company and provide financing only for commercial and multifamily properties. As evidenced by our CAD growth this quarter, our core businesses continue to perform well and the credit quality of the investments we manage remains strong."

Mr. Schnitzer continued: "The recent market dislocation has created numerous opportunities to make investments that offer attractive risk-adjusted returns and strong credit quality. In times of market instability, we would expect to see a

flight to quality that benefits firms like Centerline, that have a proven ability to assess and manage real estate risk. We will monitor market conditions carefully as we continue to execute our core strategy."

47.    **2Q:07 Form 10-Q.** The same day, August 9, 2007, Defendants filed with the SEC the Company's 2Q:07 Form 10-Q, for the quarter ended June 30, 2007, signed and certified by Defendants Levy and Schnitzer. In addition to making substantially similar statements concerning the Company operations as had been published previously, the 2Q:07 Form 10-Q again provided statements concerning the Company's Significant Accounting Policies and the Basis of its Accounting Presentation, in part, as follows:

### C.    BASIS OF PRESENTATION

The accompanying interim condensed consolidated financial statements have been prepared without audit. In the opinion of management, the interim condensed consolidated financial statements contain all adjustments (consisting of only normal recurring adjustments) necessary to present fairly the financial statements of the interim periods. Given that some of our businesses have a higher volume of transactions in the second and fourth quarterly periods, the operating results for the interim periods may not be indicative of the results for the full year.

Certain information and footnote disclosures normally included in the annual consolidated financial statements prepared in accordance with accounting principles generally accepted in the United States of America ("GAAP") have been condensed or omitted. It is suggested that these condensed consolidated financial statements be read in conjunction with the audited consolidated financial statements and notes thereto included in our Form 10-K for the year ended December 31, 2006, which contains a summary of our significant accounting policies. There have been no material changes to these items since December 31, 2006. New accounting pronouncements pending adoption that may have a significant impact on our condensed consolidated financial statements are described below.

We are responsible for the condensed consolidated financial statements included in this document. Our condensed consolidated financial statements are prepared on the accrual basis of accounting in accordance with GAAP. The preparation of financial statements in conformity with GAAP requires us to make estimates and assumptions that affect the reported amounts of assets and liabilities and the disclosure of contingent assets and liabilities at the date of the financial statements as well as the reported amounts of revenues and expenses during the reporting period.

48.    **Controls.** The Company's 2Q:07 Form 10-Q again contained representations which attested to the purported effectiveness and sufficiency of the Company's controls and procedures, as follows:

### ITEM 4. CONTROLS AND PROCEDURES.

### (a) EVALUATION OF DISCLOSURE CONTROLS AND PROCEDURES

Our Chief Executive Officer and Chief Financial Officer have evaluated the effectiveness of our disclosure controls and procedures (as defined in Rule 13a-15(e) or Rule 15a-15(e) of the Securities Exchange Act of 1934, as amended (the "Exchange Act")) as of the end of the period covered by this quarterly report. Based on such evaluation, such officers have concluded that our disclosure controls and procedures as of the end of the period covered by this quarterly report were effective to ensure that information required to be disclosed by us in the reports that we file or submit under the Exchange Act is recorded, processed, summarized and reported within the time periods specified in the SEC rules and forms, and to ensure that such information is accumulated and communicated to our management, including the Chief Executive Officer and Chief Financial Officer, as appropriate, to allow timely decisions regarding required disclosure.

\* \* \*

We expect to grow in part through acquisitions and joint ventures. To the extent we make acquisitions or enter into combinations or joint ventures, we face numerous risks and uncertainties combining or integrating the relevant businesses and systems, including the need to combine accounting and data processing systems and management controls and to integrate relationships with clients and business partners. In the case of joint ventures, we are subject to additional risks and uncertainties in that we may be dependent upon, and subject to liability, losses or reputation damage relating to, systems, controls and personnel that are not under our control. In addition, conflicts or disagreements between us and our joint venture partners may negatively impact the benefits to be achieved by the joint venture.

(b) INTERNAL CONTROL OVER FINANCIAL REPORTING The changes in our internal control over financial reporting (as defined in Rules 13a-15(f) and 15d-15(f) under the Exchange Act) that occurred during the quarter ended June 30, 2007, that have materially affected, or are reasonably likely to materially affect, our internal control over financial reporting are as follows:

o    The loan servicing, investor reporting, and asset management functions of the agency portfolio (i.e., Fannie Mae, Freddie Mac, GNMA, and other

investors) were transitioned to our Irving, Texas location along with a conversion of the servicing database to a new servicing system.

o    The Corporate Group revised the approval authority policy for debt investments, equity (including joint venture equity) investments and guarantees made by us and/or acquired through exercise of its rights under a prior investment, which was approved by the Board of Trustees.

o    The Treasury department of the Corporate Group was consolidated across all business segments.

o    The Human Resources department and its functions were transitioned to our New York corporate office from TRCLP.

Management has reviewed these material changes and obtained documentation from the process owners in order to conclude that these changes do not have a significant material impact on our controls over financial reporting.

49.    **Certifications.** In addition to the foregoing, the Company's 2Q:07 Form 10-Q contained Certifications by Defendants Levy and Schnitzer, that again attested to the purported accuracy and completeness of the Company's financial and operational reports, as follows:

**CERTIFICATION UNDER SECTION 906 OF THE**
**SARBANES-OXLEY ACT OF 2002**
**(UNITED STATES CODE, TITLE 18, CHAPTER 63, SECTION 1350)**

**ACCOMPANYING QUARTERLY REPORT ON FORM 10-Q**
**OF CENTERLINE HOLDING COMPANY**
**FOR THE QUARTER ENDED JUNE 30, 2007**

In connection with the Quarterly Report on Form 10-Q of Centerline Holding Company for the quarterly period ending June 30, 2007, as filed with the Securities and Exchange Commission on the date hereof (the "Report"), Marc D. Schnitzer, as Chief Executive Officer of our Company, and Robert L. Levy, as Chief Financial Officer of our Company, each hereby certifies, pursuant to 18 U.S.C. Section 1350, that:

(1)    The Report fully complies with the requirements of Section 13(a) or 15(d), as applicable, of the Securities Exchange Act of 1934; and

(2)    The information contained in the Report fairly presents, in all material respects, the financial condition and results of operations of our Company.

By: /s/ **MARC D. SCHNITZER**        By: /s/ **ROBERT L. LEVY**

28

--------------------------------

Marc D. Schnitzer
Chief Executive Officer
(Principal Executive Officer)


August 9, 2007

----------------------------

Robert L. Levy
Chief Financial Officer
(Principal Financial Officer and
      Principal Accounting Officer)

August 9, 2007

50.    The statements made by Defendants and contained in the Company's August 9, 2007 release and in the Company's 2Q:07 Form 10-Q were materially false and misleading when made and were know by Defendants to be false at that time, or were recklessly disregarded as such thereby, for the reasons stated herein in ¶37, *supra*.

51.    **3Q:07 Results Announced**. On November 8, 2007, Defendants published a release announcing purported results for the third quarter of 2007, the period ended September 30, 2007. This release stated, in part, the following:

Financial Highlights

The table below summarizes Centerline's revenues, revenues adjusted to exclude the impact of consolidated partnerships, Cash Available for Distribution ("CAD") (Centerline's primary performance measure) and net income (loss) for the three and nine months ended September 30, 2007 and 2006.

| (in thousands, except per share data) | Three Months Ended September 30, | | | Nine Months Ended September 30, | | |
|---|---|---|---|---|---|---|
| | 2007 | 2006 | % change | 2007 | 2006 | % change |
| Revenues | $158,351 | $107,948 | 46.7% | $410,580 | $259,010 | 58.5% |
| Revenues Adjusted to exclude Consolidated Partnerships | $104,840 | $102,356 | 2.4% | $286,327 | $265,119 | 8.0% |
| CAD | $30,144 | $43,605 | (30.9%) | $61,661 | $82,625 | (25.4%) |
| Net Income | $10,642 | $14,571 | (27.0%) | $877 | $33,476 | (97.4%) |

| Per Share Data (diluted): | | | | | | |
|---|---|---|---|---|---|---|
| CAD | $0.53 | $0.75 | (29.3%) | $1.06 | $1.40 | (24.3%) |
| Net Income (Loss) | $0.17 | $0.23 | (26.1%) | $(0.05) | $0.51 | (109.8%) |

52.    In addition to the foregoing, the November 8, 2007 release also quoted Defendant Schnitzer, in part, as follows:

"Despite the ongoing credit crisis, Centerline had another solid quarter of operations," said Marc D. Schnitzer, Chief Executive Officer and President of Centerline. "In very difficult market conditions, we closed a $585 million high-yield CMBS fund and priced and closed a $986 million CDO for one of our CMBS investment funds. We believe these accomplishments are evidence of the strength of the Centerline brand and are a strong endorsement of our ability to assess and manage real estate risk."

53.    **3Q:07 Form 10-Q.** The same day, November 8, 2007, Defendants filed with the SEC the Company's 3Q:07 Form 10-Q, for the quarter ended September 30, 2007, signed and certified by Defendants Levy and Schnitzer. In addition to making substantially similar statements concerning the Company operations as had been published previously, the 3Q:07 Form 10-Q again provided statements concerning the Company's Significant Accounting Policies and the Basis of its Accounting Presentation, in part, as follows:

**C. BASIS OF PRESENTATION**

The accompanying unaudited condensed consolidated financial statements have been prepared on a basis consistent with accounting principles generally accepted in the United States ("GAAP") for interim financial information and pursuant to the rules of the Securities and Exchange Commission ("SEC"). In the opinion of management, the condensed consolidated financial statements contain all adjustments (consisting of only normal recurring adjustments) necessary to present fairly the financial statements of the interim periods. Given that some of our businesses have a higher volume of transactions in the second and fourth quarterly periods, the operating results for the interim periods may not be indicative of the results for the full year.

These condensed consolidated financial statements should be read in conjunction with the audited consolidated financial statements and notes thereto included in our Form 10-K for the year ended December 31, 2006, which contains a summary of our significant accounting policies. There have been no material changes to these items since December 31, 2006. New accounting pronouncements pending

30

adoption that may have a significant impact on our condensed consolidated financial statements are described below.

We are responsible for the condensed consolidated financial statements included in this document....

54.    Regarding the Company's purported Mortgage Bond Investing business, the 3Q:07 Form 10-Q also stated, in part, the following:

**Mortgage Revenue Bond Investing**

The increase in mortgage revenue bond interest income is primarily due to the higher portfolio balance due to acquisition activity in the past year offset by a lower weighted average yield when analyzed against the comparable period.

While generally declining yields of bonds acquired has gradually lowered the average yield of our portfolio, we continue to earn a positive spread on our portfolio. With an increase in the average portfolio balance, our level of securitizations also increased which resulted in higher interest expense and securitization fees. By entering into a fixed rate securitization in 2006 and using interest rate swaps to fix the rate on a large portion of our remaining securitizations, we believe that we have significantly mitigated the impact on spreads of fluctuating SIFMA rates.

55.    **Controls.** The Company's 3Q:07 Form 10-Q also contained representations which again attested to the purported effectiveness and sufficiency of the Company's controls and procedures, as follows:

**ITEM 4. CONTROLS AND PROCEDURES.**

**(a) EVALUATION OF DISCLOSURE CONTROLS AND PROCEDURES**

Our Chief Executive Officer and Chief Financial Officer have evaluated the effectiveness of our disclosure controls and procedures (as defined in Rule 13a-15(e) or Rule 15a-15(e) of the Securities Exchange Act of 1934, as amended (the "Exchange Act")) as of the end of the period covered by this quarterly report. Based on such evaluation, such officers have concluded that our disclosure controls and procedures as of the end of the period covered by this quarterly report were effective to ensure that information required to be disclosed by us in the reports that we file or submit under the Exchange Act is recorded, processed, summarized and reported within the time periods specified in the SEC rules and forms, and to ensure that such information is accumulated and communicated to our management, including the Chief Executive Officer and Chief Financial

31

Officer, as appropriate, to allow timely decisions regarding required disclosure. us and our joint venture partners may negatively impact the benefits to be achieved by the joint venture.

## (b) INTERNAL CONTROL OVER FINANCIAL REPORTING

There were no changes in our internal control over financial reporting (as defined in Rules 13a-15(f) and 15d-15(f) under the Exchange Act) that occurred during the quarter ended September 30, 2007, that have materially affected, or are reasonably likely to materially affect, our internal control over financial reporting.

56.    **Certifications.** In addition to the foregoing, the Company's 3Q:07 Form 10-Q also contained Certifications by Defendants Levy and Schnitzer, that attested to the purported accuracy and completeness of the Company's financial and operational reports, as follows:

**CERTIFICATION UNDER SECTION 906 OF THE
SARBANES-OXLEY ACT OF 2002
(UNITED STATES CODE, TITLE 18, CHAPTER 63, SECTION 1350)**

**ACCOMPANYING QUARTERLY REPORT ON FORM 10-Q
OF CENTERLINE HOLDING COMPANY
FOR THE QUARTER ENDED SEPTEMBER 30, 2007**

In connection with the Quarterly Report on Form 10-Q of Centerline Holding Company for the quarterly period ending September 30, 2007, as filed with the Securities and Exchange Commission on the date hereof (the "Report"), **Marc D. Schnitzer**, as Chief Executive Officer of our Company, and **Robert L. Levy**, as Chief Financial Officer of our Company, each hereby certifies, pursuant to 18 U.S.C. Section 1350, that:

(1)    The Report fully complies with the requirements of Section 13(a) or 15(d), as applicable, of the Securities Exchange Act of 1934; and

(2)    The information contained in the Report fairly presents, in all material respects, the financial condition and results of operations of our Company.

By: /s/ **MARC D. SCHNITZER**
---------------------------------
Marc D. Schnitzer
Chief Executive Officer
(Principal Executive Officer)


By: /s/ **ROBERT L. LEVY**
----------------------------
Robert L. Levy
Chief Financial Officer
(Principal Financial Officer and
        Principal Accounting Officer)

November 8, 2007

November 8, 2007

32

57.    The statements made by Defendants and contained in the Company's November 8, 2007 release and in the Company's 3Q:07 Form 10-Q were materially false and misleading when made and were know by Defendants to be false at that time, or were recklessly disregarded as such thereby, for the reasons stated herein in ¶37, *supra*.

## THE TRUE FINANCIAL AND OPERATIONAL CONDITION OF CENTERLINE IS BELATED DISCLOSED

58.    On December 28, 2007, Defendants shocked and alarmed investors after they published a release that revealed, for the first time, that the Company was performing well below expectations and that Centerline had sold over $2.7 billion of its bond portfolio to Freddie Mac and, in the process, radically transformed the entire business and operations of the Company. As evidence of this, the release stated, in part, the following:

> NEW YORK, Dec 28, 2007 (BUSINESS WIRE) -- Centerline Holding Company (NYSE:CHC), the parent company of Centerline Capital Group, Inc. ("Centerline" or the "Company"), today announced the completion of a securitization of the Company's $2.8 billion tax-exempt affordable housing bond portfolio with Freddie Mac. For accounting purposes, most of the securitization will be treated as a sale. The transaction represents a major step in Centerline's plan to transform itself into an alternative asset management company. Centerline also announced a $131 million equity investment commitment from an affiliate of Related Companies, its largest shareholder.
>
> * * *
>
> Freddie Mac Transaction
>
> Centerline completed a securitization of the Company's $2.8 billion tax-exempt affordable housing bond portfolio with Freddie Mac. The bond portfolio is secured by mortgages on approximately 59,000 units of affordable multifamily properties in 31 states. For accounting purposes, most of the securitization will be treated as a sale. Centerline retained a high-yielding first-loss position (the "B-Piece") in the portfolio and will remain the primary and special servicer.
>
> * * *
>
> Centerline used the proceeds from the Freddie Mac bond securitization to redeem its existing financing arrangements, retire corporate debt and pay the costs and expenses associated with the transaction.

33

In connection with the transaction, Centerline expects to record net, one-time charges of $45 million to $55 million in the fourth quarter of 2007. Net of minority interest allocations, the Company expects these charges to reduce net income by $30 million to $40 million. Gains incorporated in the net charge include a gain on the sale of the bonds, previously deferred revenues and recovery of impairment charges. Losses incorporated in the net charge include writing off deferred costs associated with the bonds and securitization trusts, recognizing fair value losses on certain interest rate swaps, costs to terminate existing financing arrangements and transaction related costs. These transaction-related costs of approximately $95 million will impact the Company's 2007 Cash Available for Distribution ("CAD"). Centerline has reduced the Company's previous CAD per share guidance for 2007 from $1.89 to a range of $1.70 to $1.75, exclusive of the transaction related costs associated with the securitization.

59.    The radical revision of the Company was described in the release in part, as

follows:

Repositioning as an Alternative Asset Manager

Centerline will implement several strategic initiatives to further align the Company with other publicly-traded alternative asset managers, including:

--    Increase Assets Under Management: Centerline anticipates raising $3.3 billion - $4.0 billion of new assets under management in 2008, including $1.7 billion - $2.0 billion of commercial real estate debt and equity funds, $1.0 billion - $1.2 billion of affordable housing funds and new mortgage bond investments and $600 million - $800 million of commercial loan investments.

--    Change Revenue Composition: The nature of Centerline's revenue composition has changed and will now be derived from (i) investment management fees, including fund sponsorship, asset management, servicing and incentive fees; (ii) transactional fees, including origination and credit enhancement fees; and (iii) investment income, including income from co-investments and interest. Centerline anticipates investment management fees and transactional fees will comprise approximately 60% - 65% of the Company's revenues in 2008.

--    Reduce Leverage: Centerline repaid the Company's existing term loan and revolver and entered into two new debt facilities, resulting in a net reduction of $120 million of corporate debt, including liabilities associated with the transaction. The new facilities include a revolving line of credit with a maximum capacity of $300 million and a term loan with a maximum capacity of $150 million. The lead arrangers of the new debt

34

facilities are Bank of America and Citibank. Centerline expects its future corporate debt levels to be significantly lower than in the past.

\* \* \*

-- Utilize New Earnings Metrics: Beginning in the first quarter of 2008, Centerline will no longer report CAD as a financial metric. Instead, Centerline will report Adjusted Earnings per Share ("Adjusted EPS"). Adjusted EPS is defined as earnings per share computed pursuant to generally accepted accounting principles ("GAAP") and adjusted for non-cash amortization of acquired intangible assets and acquisition-related, share-based compensation.

60.    As a result of the foregoing, at that time Defendants also lowered forward guidance and radically revised dividend projections, as follows:

2008 Earnings Guidance

Centerline anticipates Adjusted EPS for 2008 will range between $1.00 and $1.10.

| Reconciliation of Adjusted Earnings Per Share to GAAP Earnings Per Share Guidance (per share) | Low | High |
|---|---|---|
| GAAP Earnings Per Share | $0.84 | $0.94 |
| Amortization of Intangible Assets | $0.11 | $0.11 |
| Amortization of Acquisition-Related Share-Based Compensation | $0.05 | $0.05 |
| Adjusted Earnings Per Share | $1.00 | $1.10 |

\* \* \*

Change Dividend Policy: Effective in the first quarter of 2008, Centerline's dividend on an annualized basis is expected to be $0.60 per share ($0.15 on a quarterly basis), subject to approval by our Board of Trustees. The Company will deploy its retained cash flows to fund growth and reduce debt. Centerline anticipates 30% to 35% of the Company's income will be federally tax-exempt in 2008.

61.    In addition, this release also described a contemplated transaction designed to benefit Company insiders—including primarily Defendants Ross, Blau and TRCLP—at the

35

expense of shareholders, whereby Defendants arranged to secure an 11% interest payment on a

$131 million investment in 131.25 million shares of Company stock, as follows:

> $131 Million Investment from An Affiliate of Related Companies

> An affiliate of Related Companies has committed to invest $131,250,000 in Centerline Holding Company through a newly-issued convertible preferred stock. The preferred stock will pay dividends at an 11% annual distribution rate and will be convertible at a $10.75 per share conversion rate for an aggregate of approximately 12.2 million common shares of Centerline Holding Company. The transaction, which is subject to completion of definitive documentation, is expected to close in January 2008. Centerline will use the net proceeds to reduce corporate debt and fund the Company's growth plans.

62.    Immediately following the publication of this release, the Company also hosted a

conference call during which Defendants revealed that their plan to radically revise Centerline

from a tax-exempt bond fund into a much higher risk, asset manager had been in the planning

stages since at least the inception of the Class Period. During this call, Defendants also revealed

that despite the purported nature of the "sale," the Company would remain liable for at least

$140 million in initial defaults or principal losses on the tax-exempt bond portfolio it purportedly

sold. According to statements made by Schnitzer during the call, even after the purported sale,

Centerline remained liable for the first $140 million in losses related to the sold portfolio.

63.    During the question and answer session of the same call, outraged shareholders

protested that Defendants were running Centerline "like a private company," and that TRCLP,

Ross and Blau had engaged in improper self-dealing in order to arrange a bail-out that amounted

to nothing more than a "sweet-heart" deal for insiders. Moreover, other outraged shareholders

described the transaction as "contemptuous" of existing shareholders. Others on the call

described the transaction as "disgusting," "egregious," and "disingenuous."

64.    The belated revelations that Defendants had been secretly engaged in working on

a transaction to radically transform the Company's business model for at least a year, that

Defendants had arranged an overly favorable bail-out with insiders, Ross, Blau and TRCLP, and that the effect of this transaction was to substantially slash dividends and earnings, caused shares of the Company to immediately decline. Thus, following this announcement, shares of the Company plummeted, falling over 25% in the single trading day and slipping to a close of $7.70 per share, from a prior day's close of $10.27 per share. That day, over 4.152 million shares traded—many times the Company's average daily trading volume.

65.    On January 16, 2008, as shares of the Company traded below $6.00 per share, a decline of almost 75% from the trading high of the Class Period, *The Wall Street Journal* reported on the Centerline disaster and wrote, in part, the following:

> Real-Estate Finance: Related's Ross Stirs a Storm --- Return on Centerline Infusion, Dividend Cut Anger Investors While Shares Take Long Fall
>
> * * *
>
> "How could insiders reach such a favorable deal for themselves?" one investor, Patrick Collins, asked in a Dec. 28 shareholder conference call, according to a transcript provided by Thomson Financial. "I would be disgusted if I were you at what you've done. I would be ashamed at what I did."
>
> The transaction in question: Mr. Ross's Related Cos. made a commitment for a $131.3 million investment in Centerline. In return, Related will receive convertible preferred stock that would distribute an annual dividend of 11%. That coupon was deemed "very expensive," by Tony Howard of Hilliard Lyons, the sole remaining analyst who followed the stock. Mr. Howard, who dropped coverage after the announcement, declined to be interviewed.
>
> Mr. Ross didn't return calls seeking comment.
>
> * * *
>
> Yet, Centerline executives angered long-term shareholders by cutting the tax-advantaged dividend by 64% -- from $1.68 to 60 cents annually. That cut, combined with Mr. Ross's potential conflict of interest, caused some shareholders to see the timing of the announcement as suspicious, because many Centerline investors were traveling for the holidays.
>
> Investors who did phone into the call gave management an earful, pointing out

37

that Centerline has lost 70% of its value in 12 months. According to the transcript, Parker Phillips of Bondurant Management said: "You guys have done a terrible job in the last two years, and this just sort of caps it off. So, thanks a lot."

## CAUSATION AND ECONOMIC LOSS

66.    During the Class Period, as detailed herein, Defendants engaged in a scheme to deceive the market, and a course of conduct that artificially inflated Centerline's stock price and operated as a fraud or deceit on Class Period purchasers of Centerline's stock by misrepresenting the Company's financial condition and results of operations. Over a period of approximately twelve months, Defendants mislead investors regarding the Company's true financial and operational results and condition. Ultimately, however, when Defendants' prior misrepresentations and fraudulent conduct came to be revealed and was apparent to investors, shares of Centerline declined precipitously—evidence that the prior artificial inflation in the price of Centerline's shares was eradicated. As a result of their purchases of Centerline stock during the Class Period, plaintiff and other members of the Class suffered economic losses, *i.e.* damages under the federal securities laws.

67.    By improperly characterizing the Company's operational and financial condition and misrepresenting its prospects, the Defendants presented a misleading image of Centerline's business and future growth prospects. During the Class Period, Defendants repeatedly emphasized the ability of the Company to grow its bond portfolio business, to monitor and control expenses, and to pay dividends consistent with the Company's prior dividend payments within expectations and within the range for which the Company was properly positioned. These claims caused and maintained the artificial inflation in Centerline's stock price throughout the Class Period and until the truth about the Company was ultimately revealed to investors.

68.    On December 28, 2007, however, as investors learned the truth about the Company, and learned that Defendants had failed to report the Company's true condition and performance, shares of the Company collapsed. Defendants' belated disclosures had an immediate, adverse impact on the price of Centerline shares.

69.    These belated revelations also evidenced Defendants' prior falsification of Centerline's business prospects due to Defendants' false statements. As investors and the market ultimately learned, the Company's prior business prospects had been overstated as were the Company's results of operations. As this adverse information became known to investors, the prior artificial inflation began to be eliminated from Centerline's share price and investors were damaged as a result of the related share price decline.

70.    As a direct result of investors learning the truth about the Company on January 28, 2007, Centerline's stock price collapsed over 25%, from a close of $10.27 per share to approximately $7.70 per share, in the single trading day—on very high trading volume of over 4.152 million shares traded. This dramatic share price decline eradicated much of the artificial inflation from Centerline's share price, causing real economic loss to investors who purchased this stock during the Class Period.

71.    The decline in Centerline's stock price at the end of the Class Period was a direct result of the nature and extent of Defendants' fraud being revealed to investors and to the market. The timing and magnitude of Centerline's stock price decline negates any inference that the losses suffered by plaintiff and the other members of the Class was caused by changed market conditions, macroeconomic or industry factors or even Company-specific facts unrelated to Defendants' fraudulent conduct. During the same period in which Centerline's share price fell

over 25% as a result of Defendants' fraud being revealed, the Standard & Poor's 500 securities index was relatively unchanged.

72.    The economic loss, *i.e.* damages suffered by plaintiff and other members of the Class, was a direct result of Defendants' fraudulent scheme to artificially inflate the price of Centerline's stock and the subsequent significant decline in the value of the Company's shares when Defendants' prior misstatements and other fraudulent conduct was revealed. The dramatic decline in the price of Company shares immediately following Defendants' belated disclosure is evidenced, in part, by the chart below:



## VIOLATIONS OF GAAP AND SEC REPORTING RULES

73.    During the Class period, Defendants materially misled the investing public, thereby inflating the price of the Company's securities, by publicly issuing false and misleading statements and omitting to disclose material facts necessary to make Defendants' statements, as set forth herein, not false and misleading. Said statements and omissions were materially false and misleading in that they failed to disclose material adverse information and misrepresented

the truth about the Company, its operational and financial performance, accounting, reporting, and financial condition in violation of the federal securities laws and GAAP.

74.    GAAP consists of those principles recognized by the accounting profession as the conventions, rules, and procedures necessary to define accepted accounting practice at the particular time. Regulation S-X, to which the Company is subject as a registrant under the Exchange Act, 17 C.F.R. 210.4-01(a)(1), provides that financial statements filed with the SEC which are not prepared in compliance with GAAP, are presumed to be misleading and inaccurate. SEC Rule 13a-13 requires issuers to file quarterly reports.

75.    SEC Rule 12b-20 requires that periodic reports contain such further information as is necessary to make the required statements, in light of the circumstances under which they are made, not misleading.

76.    In addition, Item 303 of Regulation S-K requires that, for interim periods, the Management Division and Analysis Section ("MD&A") must include, among other things, a discussion of any material changes in the registrant's results of operations with respect to the most recent fiscal year-to-date period for which an income statement is provided. Instructions to Item 303 require that the this discussion identify any significant elements of registrant's income or loss from continuing operations that are not necessarily representative of the registrant's ongoing business. Item 303(a)(2)(ii) to Regulation S-K requires the following discussion in the MD&A of a company's publicly filed reports with the SEC:

> Describe any known trends or uncertainties that have had or that the registrant reasonably expects will have a material favorable or unfavorable impact on net sales or revenues or income from continuing operations. If the registrant knows of events that will cause a material change in the relationship between costs and revenues (such as known future increases in costs of labor or materials or price increases or inventory adjustments), the change in relationship shall be disclosed.

Paragraph 3 of the Instructions to Item 303 states in relevant part:

The discussion and analysis shall focus specifically on material events and uncertainties known to management that would cause reported financial information not to be necessarily indicative of future operating results or of future financial condition. This would include descriptions and amounts of (A) matters that would have an impact on future operations and have not had an impact in the past. . .

77.    The GAAP requirement for recognition of an adequate provision for foreseeable costs and an associated allowance applies to interim financial statements as required by Accounting Principles Board Opinion No. 28. Paragraph 17 of this authoritative pronouncement states that:

The amounts of certain costs and expenses are frequently subjected to year-end adjustments even though they can be reasonably approximated at interim dates. To the extent possible such adjustments should be estimated and the estimated costs and expenses assigned to interim periods so that the interim periods bear a reasonable portion of the anticipated annual amount.

78.    The Company's financial statements contained in the annual report filed with the SEC on Form 10-K for 2006 and the interim reports filed with the SEC pursuant to Form(s) 10-Q for the quarterly periods throughout the Class Period, were presented in a manner that violated the principle of fair financial reporting and the following GAAP, among others:

(a)    The principle that financial reporting should provide information that is useful to present and potential investors and creditors and other users in making rational investment, credit and similar decisions (FASB Statement of Concepts No. 1).

(b)    The principle that financial reporting should provide information about an enterprise's financial performance during a period (FASB Statement of Concepts No. 1).

(c)    The principle that financial reporting should be reliable in that it represents what it purports to represent (FASB Statement of Concepts No. 2).

(d)    The principle of completeness, which means that nothing material is left out of the information that may be necessary to ensure that it validly represents underlying events and conditions (FASB Statement of Concepts No. 2).

(e)    The principle that conservatism be used as a prudent reaction to uncertainty to try to ensure that uncertainties and risks inherent in business situations are adequately considered (FASB Statement of Concepts No. 2).

(f)    The principle that contingencies and other uncertainties that affect the fairness of presentation of financial data at an interim date shall be disclosed in interim reports in the same manner required for annual reports (APB Opinion No. 28).

(g)    The principle that disclosures of contingencies shall be repeated in interim and annual reports until the contingencies and have been removed, resolved, or have become immaterial (APB Opinion No. 28).

(h)    The principle that management should provide commentary relating to the effects of significant events upon the interim financial results (APB Opinion No. 28).

79.    In addition, during the Class Period, Defendants violated SEC disclosure rules:

(a)    Defendants failed to disclose the existence of known trends, events or uncertainties that they reasonably expected would have a material, unfavorable impact on net revenues or income or that were reasonably likely to result in the Company's liquidity decreasing in a material way, in violation of Item 303 of Regulation S-K under the federal securities laws (17 C.F.R. 229.303), and that failure to disclose the information rendered the statements that were made during the Class Period materially false and misleading; and

(b)    by failing to file financial statements with the SEC that conformed to the requirements of GAAP, such financial statements were presumptively misleading and inaccurate pursuant to Regulation S-X, 17 C.F.R. § 210.4-01(a)(1).

80.    Defendants were required to disclose, in the Company's true operational condition and financial statements, the existence of the material facts described herein and to appropriately recognize and report assets, revenues, and expenses in conformity with GAAP. The Company failed to make such disclosures and to account for and to report its operations and financial statements in conformity with GAAP. Defendants knew, or were reckless in not knowing, the facts which indicated that all of the Company's interim financial statements, press releases, public statements, and filings with the SEC, which were disseminated to the investing public during the Class Period, were materially false and misleading for the reasons set forth herein. Had the true financial position and results of operations of the Company been disclosed during the Class period, the Company's common stock would have traded at prices well below that which it did.

## ADDITIONAL SCIENTER ALLEGATIONS

81.    As alleged herein, Defendants acted with scienter in that each Defendant knew that the public documents and statements issued or disseminated in the name of the Company were materially false and misleading; knew that such statements or documents would be issued or disseminated to the investing public; and knowingly and substantially participated or acquiesced in the issuance or dissemination of such statements or documents as primary violations of the federal securities laws. As set forth elsewhere herein in detail, Defendants, by virtue of their receipt of information reflecting the true facts regarding Centerline, their control over, and/or receipt and/or modification of Centerline's allegedly materially misleading

44

misstatements and/or their associations with the Company which made them privy to confidential proprietary information concerning Centerline, participated in the fraudulent scheme alleged herein.

82.    Defendants were motivated to materially misrepresent to the SEC and investors the true financial condition of the Company because: (i) it deceived the investing public regarding Centerline's business, operations, management and the intrinsic value of Centerline common stock; (ii) it enabled Defendants to artificially inflate the price of Centerline shares; (iii) it enabled Defendants to arrange to sell the Company's most productive assets, and to arrange to allow Defendants Ross, Blau and TRCLP to invest in Centerline on preferential terms—not favorable to Centerline's public shareholders; and (iv) it caused plaintiff and other members of the Class to purchase Centerline common stock at artificially inflated prices.

<div align="center">

**Applicability of Presumption of Reliance:**
**<u>Fraud-On-The-Market Doctrine</u>**

</div>

83.    At all relevant times, the market for Centerline's common stock was an efficient market for the following reasons, among others:

(a)    Centerline's stock met the requirements for listing, and was listed and actively traded on the NYSE national market exchange, a highly efficient and automated market;

(b)    As a regulated issuer, Centerline filed periodic public reports with the SEC and the NYSE;

(c)    Centerline regularly communicated with public investors *via* established market communication mechanisms, including through regular disseminations of press releases on the national circuits of major newswire services and through other wide-ranging public disclosures, such as communications with the financial press and other similar reporting services; and

<div align="center">45</div>

(d)    Centerline was followed by several securities analysts employed by major brokerage firm(s) who wrote reports which were distributed to the sales force and certain customers of their respective brokerage firm(s). Each of these reports was publicly available and entered the public marketplace.

84.    As a result of the foregoing, the market for Centerline securities promptly digested current information regarding Centerline from all publicly available sources and reflected such information in Centerline stock price. Under these circumstances, all purchasers of Centerline common stock during the Class Period suffered similar injury through their purchase of Centerline common stock at artificially inflated prices and a presumption of reliance applies.

## NO SAFE HARBOR

85.    The statutory safe harbor provided for forward-looking statements under certain circumstances does not apply to any of the allegedly false statements pleaded in this complaint. Many of the specific statements pleaded herein were not identified as "forward-looking statements" when made. To the extent there were any forward-looking statements, there were no meaningful cautionary statements identifying important factors that could cause actual results to differ materially from those in the purportedly forward-looking statements. Alternatively, to the extent that the statutory safe harbor does apply to any forward-looking statements pleaded herein, Defendants are liable for those false forward-looking statements because at the time each of those forward-looking statements was made, the particular speaker knew that the particular forward-looking statement was false, and/or the forward-looking statement was authorized and/or approved by an executive officer of Centerline who knew that those statements were false when made.

## BASIS OF ALLEGATIONS

86.    Plaintiff has alleged the following based upon the investigation of plaintiff's counsel, which included a review of SEC filings by Centerline, as well as regulatory filings and reports, securities analysts' reports and advisories about the Company, press releases and other public statements issued by the Company, and media reports about the Company, and plaintiff believes that substantial additional evidentiary support will exist for the allegations set forth herein after a reasonable opportunity for discovery.

## FIRST CLAIM

### Violation Of Section 10(b) Of
### The Exchange Act And Rule 10b-5
### Promulgated Thereunder Against All Defendants

87.    Plaintiff repeats and re-alleges each and every allegation contained above as if fully set forth herein.

88.    During the Class Period, Defendants carried out a plan, scheme and course of conduct which was intended to and, throughout the Class Period, did: (i) deceive the investing public regarding Centerline's business, operations, management and the intrinsic value of Centerline common stock; (ii) enable Defendants to artificially inflate the price of Centerline shares; (iii) enable Defendants to arrange to sell the Company's most productive assets, and to arrange to allow Defendants Ross, Blau and TRCLP to invest in Centerline on preferential terms—not favorable to Centerline's public shareholders; and (iv) cause plaintiff and other members of the Class to purchase Centerline common stock at artificially inflated prices. In furtherance of this unlawful scheme, plan and course of conduct, Defendants, jointly and individually (and each of them) took the actions set forth herein.

47

89.     Defendants (a) employed devices, schemes, and artifices to defraud; (b) made untrue statements of material fact and/or omitted to state material facts necessary to make the statements not misleading; and (c) engaged in acts, practices, and a course of business which operated as a fraud and deceit upon the purchasers of the Company's common stock in an effort to maintain artificially high market prices for Centerline's common stock in violation of Section 10(b) of the Exchange Act and Rule 10b-5. All Defendants are sued either as primary participants in the wrongful and illegal conduct charged herein or as controlling persons as alleged below.

90.     Defendants, individually and in concert, directly and indirectly, by the use, means or instrumentalities of interstate commerce and/or of the mails, engaged and participated in a continuous course of conduct to conceal adverse material information about the business, operations and future prospects of Centerline as specified herein.

91.     These Defendants employed devices, schemes and artifices to defraud, while in possession of material adverse non-public information and engaged in acts, practices, and a course of conduct as alleged herein in an effort to assure investors of Centerline's value and performance and continued substantial growth, which included the making of, or the participation in the making of, untrue statements of material facts and omitting to state material facts necessary in order to make the statements made about Centerline and its business operations and future prospects in the light of the circumstances under which they were made, not misleading, as set forth more particularly herein, and engaged in transactions, practices and a course of business which operated as a fraud and deceit upon the purchasers of Centerline common stock during the Class Period.

92.     Each of the Individual Defendants' primary liability, and controlling person liability, arises from the following facts: (i) the Individual Defendants were high-level executives and/or directors at the Company during the Class Period and members of the Company's management team or had control thereof; (ii) each of these Defendants, by virtue of his responsibilities and activities as a senior officer and/or director of the Company was privy to and participated in the creation, development and reporting of the Company's internal budgets, plans, projections and/or reports; (iii) each of these Defendants enjoyed significant personal contact and familiarity with the other Defendants and was advised of and had access to other members of the Company's management team, internal reports and other data and information about the Company's finances, operations, and sales at all relevant times; and (iv) each of these Defendants was aware of the Company's dissemination of information to the investing public which they knew or recklessly disregarded was materially false and misleading.

93.     The Defendants had actual knowledge of the misrepresentations and omissions of material facts set forth herein, or acted with reckless disregard for the truth in that they failed to ascertain and to disclose such facts. Such Defendants' material misrepresentations and/or omissions were done knowingly or with recklessly for the purpose and effect of concealing Centerline's operating condition and future business prospects from the investing public and supporting the artificially inflated price of its common stock. As demonstrated by Defendants' overstatements and misstatements of the Company's business, operations and earnings throughout the Class Period, Defendants, if they did not have actual knowledge of the misrepresentations and omissions alleged, were reckless in failing to obtain such knowledge by recklessly refraining from taking those steps necessary to discover whether those statements were false or misleading.

49

94.    As a result of the dissemination of the materially false and misleading information and failure to disclose material facts, as set forth above, the market price of Centerline common stock was artificially inflated during the Class Period. In ignorance of the fact that market prices of Centerline's publicly-traded common stock were artificially inflated, and relying directly or indirectly on the false and misleading statements made by Defendants, or upon the integrity of the market in which the securities trade, and/or on the absence of material adverse information that was known to or recklessly disregarded by Defendants but not disclosed in public statements by Defendants during the Class Period, plaintiff and the other members of the Class acquired Centerline common stock during the Class Period at artificially high prices and were damaged thereby.

95.    At the time of said misrepresentations and omissions, plaintiff and other members of the Class were ignorant of their falsity, and believed them to be true. Had plaintiff and the other members of the Class and the marketplace known the truth regarding the problems that Centerline was experiencing, which were not disclosed by Defendants, plaintiff and other members of the Class would not have purchased or otherwise acquired their Centerline common stock, or, if they had acquired such common stock during the Class Period, they would not have done so at the artificially inflated prices which they paid.

96.    By virtue of the foregoing, Defendants have violated Section 10(b) of the Exchange Act, and Rule 10b-5 promulgated thereunder.

97.    As a direct and proximate result of Defendants' wrongful conduct, plaintiff and the other members of the Class suffered damages in connection with their respective purchases and sales of the Company's common stock during the Class Period.

## SECOND CLAIM

### Violation Of Section 20(a) Of
### The Exchange Act Against Individual Defendants

98.     Plaintiff repeats and re-alleges each and every allegation contained above as if fully set forth herein.

99.     The Individual Defendants acted as controlling persons of Centerline within the meaning of Section 20(a) of the Exchange Act as alleged herein. By virtue of their high-level positions, and their ownership and contractual rights, participation in and/or awareness of the Company's operations and/or intimate knowledge of the false financial statements filed by the Company with the SEC and disseminated to the investing public, the Individual Defendants had the power to influence and control and did influence and control, directly or indirectly, the decision-making of the Company, including the content and dissemination of the various statements which plaintiff contends are false and misleading. The Individual Defendants were provided with or had unlimited access to copies of the Company's reports, press releases, public filings and other statements alleged by plaintiff to be misleading prior to and/or shortly after these statements were issued and had the ability to prevent the issuance of the statements or cause the statements to be corrected.

100.    In particular, each of these Defendants had direct and supervisory involvement in the day-to-day operations of the Company and, therefore, is presumed to have had the power to control or influence the particular transactions giving rise to the securities violations as alleged herein, and exercised the same.

101.    As set forth above, Centerline and the Individual Defendants each violated Section 10(b) and Rule 10b-5 by their acts and omissions as alleged in this Complaint. By virtue of their positions as controlling persons, the Individual Defendants are liable pursuant to Section

51

20(a) of the Exchange Act. As a direct and proximate result of Defendants' wrongful conduct, plaintiff and other members of the Class suffered damages in connection with their purchases of the Company's common stock during the Class Period.

WHEREFORE, plaintiff prays for relief and judgment, as follows:

A.    Determining that this action is a proper class action, designating plaintiff as Lead Plaintiff and certifying plaintiff as a class representative under Rule 23 of the Federal Rules of Civil Procedure and plaintiff's counsel as Lead Counsel;

B.    Awarding compensatory damages in favor of plaintiff and the other Class members against all Defendants, jointly and severally, for all damages sustained as a result of Defendants' wrongdoing, in an amount to be proven at trial, including interest thereon;

C.    Awarding plaintiff and the Class their reasonable costs and expenses incurred in this action, including counsel fees and expert fees;

D.    Awarding extraordinary, equitable and/or injunctive relief as permitted by law, equity and the federal statutory provisions sued hereunder, pursuant to Rules 64 and 65 and any appropriate state law remedies to assure that the Class has an effective remedy; and

E.    Such other and further relief as the Court may deem just and proper.

## JURY TRIAL DEMANDED

Plaintiff hereby demands a trial by jury.

Dated: February 27, 2008

Kim E. Miller
**KAHN GAUTHIER SWICK, LLC**
12 East 41st Street
New York, NY 10017
Telephone: (212) 696 - 3730
Facsimile: (504) 455-1498

Lewis Kahn
**KAHN GAUTHIER SWICK, LLC**
650 Poydras Street - Suite 2150
New Orleans, LA 70130
Telephone: (504) 455-1400
Facsimile: (504) 455-1498

**Attorneys for Plaintiff**

## CERTIFICATION IN SUPPORT OF APPLICATION FOR LEAD PLAINTIFF

_Brian Quill_ (name) ("plaintiff") declares, as to the claims asserted under the federal securities law, that:

1.    Plaintiff has fully reviewed the facts of the complaint(s) filed in this action alleging violations of the securities laws and plaintiff is willing to serve as a lead plaintiff in this case and all other related cases that may be consolidated with it.

2.    Plaintiff did not purchase securities of Centerline Holding Company at the direction of counsel or in order to participate in a private action under the federal securities laws.

3.    Plaintiff is willing to serve as a representative party on behalf of a class, including providing testimony at deposition and trial, if necessary.

4.    During the Class Period, plaintiff has executed transactions in the securities of Centerline Holding Company as follows. See Attached Schedule.

5.    In the last three years, plaintiff has not sought to serve as a representative party on behalf of a class in an action filed under the federal securities laws, except as indicated herein.

6.    Plaintiff will not accept payment for serving as a lead plaintiff beyond its pro rata share of any recovery, except such reasonable costs and expenses (including lost wages) directly relating to the representation of the Class as ordered or approved by the Court.

I declare under penalty of perjury under the laws of the United States of America that the foregoing is true and correct.

Dated:  _Jan. 31_ , 2008

_____
Plaintiff

Name of plaintiff: *Brian Quill*
Schedule of plaintiff's Transaction(s) in
Centerline Holding Company

Purchase(s):

| Date | Units | Price |
|---|---|---|
| August 14, 2007 | 200 | $13.8202 = $2,764.04 |
| November 1, 2007 | 100 | $13.2599 = $1,325.99 |
| September 6, 2006 | 100 | $19.99 = $1,999.00 |
| July 18, 2007 | 100 | $16.5934 = $1,659.34 |
| August 22, 2006 | 200 | $19.67 = $3,934 |

Total: $11,682.37

Sale(s):

| Date | Units | Price |
|---|---|---|

# UNITED STATES DISTRICT COURT
## SOUTHERN DISTRICT OF NEW YORK

|  |  |
|---|---|
| BRIAN QUILL, Individually And<br>On Behalf of All Others Similarly Situated,<br><br>Plaintiff,<br><br>vs.<br><br>CENTERLINE HOLDING CO., INC., MARC D.<br>SCHNITZER, ROBERT L. LEVY, STEPHEN<br>M. ROSS, JEFF T. BLAU, and LEONARD W.<br>COTTON,<br><br><br>Defendants | **CIVIL ACTION NO.**<br>**08-CV-01902**<br><br><br><br><br>**CERTIFICATE OF SERVICE** |

I, Melissa Clark, an attorney admitted to practice in the State of New York and an associate of the firm Kahn Gauthier Swick, LLC, hereby certify that:

The Corrected Class Action Complaint for Violations of Federal Securities Laws ("corrected complaint"), dated February 27, 2008, will be served by US Mail on February 27, 2008 to the defendants below.  A courtesy copy of the corrected complaint will also be provided to each defendant below at the time it is served with the Summons and Class Action Complaint for Violations of Federal Securities Laws dated February 26, 2008,

**Centerline Holding Co., Inc.**
625 Madison Avenue
New York, NY 10022

**Jeff T. Blau**
428 E. HYMAN AVE
ASPEN, CO 81611-1920

**Robert L. Levy**
625 Madison Avenue
New York, NY 10022

**Leonard W. Cotton**
625 Madison Avenue
New York, NY 10022

**Stephen M. Ross**
702 N. COUNTY RD 1N
PALM BEACH, FL 33480-3335

**Marc D. Schnitzer**
21 HAMPTON RD
SCARSDALE, NY 10583-3028

Dated: New York, New York
February 27, 2008

      s/Melissa R. Clark
       Melissa R. Clark